# EXHIBIT "1"

FILED
STUART SHAW

MAR 22 2019

CLERK OF COURT
RED RIVER PARISH

37402

| | | |
|---|---|---|
| JAMES AND WILMA SELF | § | DOCKET NO. _____ |
| | § | |
| VERSUS | § | |
| | § | 39TH JUDICIAL DISTRICT COURT |
| BHP BILLITON PETROLEUM | § | |
| (TXLA OPERATING) CO. | § | RED RIVER PARISH, LOUISIANA |

## PETITION AGAINST BHP BILLITON PETROLEUM (TXLA OPERATING) COMPANY FOR CLASS CERTIFICATION, DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES

NOW INTO COURT, through undersigned counsel, comes JAMES AND WILMA SELF, Husband and Wife (hereinafter, "Petitioners"), who, pursuant to La. C.C.P. art. 591 brings this petition individually and on behalf of all others similarly situated (the "Class"), and represents as follows:

### PRELIMINARY STATEMENT

1.

The named Petitioners and the Class they seek to represent own unleased mineral interests in the State of Louisiana which are situated within compulsory drilling units formed by the Louisiana Office of Conservation and operated by BHP BILLITON PETROLEUM (TXLA OPERATING) COMPANY, or one of its parents or affiliates (referred to herein, whether one or more, as "Defendant").

2.

Neither Petitioners, nor the Class, have made separate arrangements to dispose of their allocable shares of production from the units.

3.

Defendant, as operator of the units, has opted to market, on behalf of Petitioners and the Class, each unleased owner's proportionate share of production.

4.

La. R.S.30:10 A. (3) states that if a unit operator proceeds with a sale of an unleased mineral owner's unit production, then that unit operator shall pay to the unleased owner his tract's pro-rata share of the proceeds of the sale of production.

ATTEST A TRUE COPY
Stuart Shaw, Clerk
Deputy Clerk/39th JDC

5.

Defendant has failed to pay the Petitioners and the Class their pro-rata share of the sales of production from the units in which they own unleased mineral interests.

6.

For at least the past ten (10) years, Defendant has regularly and improperly deducted against the sale proceeds due to unleased owners certain costs and expenses purportedly incurred by Defendant, but which are not actual reasonable expenditures incurred in drilling, testing, completing, equipping, or operating the wells it operates. These costs include, among other things, costs of gathering, compressing, treating, fuel and lease use, and transporting natural gas from the wells.   These costs also include overall marketing costs related to either gathering or transportation, including without limitation, minimum volume commitments or capacity reservation fees.   For purposes of this petition, the improperly deducted costs described herein are collectively referred to as "Post-Production Costs." The improperly-charged Post-Production Costs have reduced the amount received by Petitioners and the Class.

7.

Petitioners and the Class request declaratory and permanent injunctive relief to enjoin Defendant from deducting Post-Production Costs from their allocable share of production proceeds under La. R.S. 30:10 A. (3), and damages in the amount of the improperly-deducted costs.

8.

In the alternative, should it be found that Post-Production Costs are applicable under La. R.S. 30:10 A. (3), which is denied, Petitioners allege on information and belief that Defendant has deducted minimum volume commitment penalties related to the gathering, compression and treatment from Petitioners' and the Class' allocable share of production proceeds (the "Gathering Volume Commitments").

9.

Petitioners also allege on information and belief that Defendant has deducted firm transportation volume commitments, or un-utilized capacity fees, for pipeline services beyond the gathering system (the "Transportation Volume Commitments").

10.

The Gathering and Transportation Volume Commitments are not related to the movement of Petitioners' or the Class' production through a pipeline system but are, instead, incurred as a result of the overall marketing plan chosen by Defendant for its benefit and Defendant's subsequent failure to meet their negotiated commitments.

11.

Therefore, in the alternative to Petitioners' claim that no Post-Production Costs are applicable to an unleased owner under La. R.S. 30:10, Petitioners and the Class request declaratory and permanent injunctive relief to enjoin Defendant from deducting any Post-Production Costs which represent Gathering Volume Commitments or Transportation Volume Commitments from Petitioners' or the Class' allocable share of production proceeds.

12.

Further in the alternative, should it be found that Post-Production Costs are applicable under La. R.S. 30:10 A. (3), which is denied, Petitioners and the Class allege upon information and belief that all of the Post-Production Costs incurred based upon the movement of production through the "Kinderhawk" gathering system [1] are costs resulting from negotiations between affiliated parties which resulted in the Kinderhawk Gas Gathering Agreement (the "Kinderhawk GGA"). The post-production costs imposed under the Kinderhawk GGA were set at amounts that greatly increased the profit derived by Defendant and its affiliates at the expense of Petitioners and the Class.

13.

For this reason, such Post-Production Costs incurred on account of the Kinderhawk GGA are not lawfully applicable to an unleased owner under La. R.S. 30:10, and therefore the Petitioners and the Class request declaratory and permanent injunctive relief to enjoin Defendant from deducting such Post-Production Costs incurred in relation to the Kinderhawk GGA from Petitioners' or the Class' allocable share of production proceeds.

---

[1]     Such Post-Production Costs are believed to include gathering, treatment and compression costs.

14.

Finally, Petitioners, on behalf of themselves and the Class, request an accounting to recover compensable damages caused by Defendant's violations of La. R.S. 30:10.

PARTIES.

15.

Petitioners appearing herein are:

a)   JAMES AND WILMA SELF, husband and wife, each a natural person, of the full age of majority, and domiciled in, and a citizen of the State of Louisiana, Red River Parish, individually, and on behalf of all others similarly situated as the proposed representative of the Petitioners' Class, which he seeks to have certified pursuant to La. C.C.P. arts. 591 and 592.

16.

Made Defendant herein is BHP BILLITON PETROLEUM (TXLA OPERATING) COMPANY.

JURISDICTION

17.

This Court has jurisdiction pursuant to the Louisiana Constitution, the United States Constitution, La. C.C.P. art. 1, *et seq.*, and La. R.S. 13:3201. Petitioners' claims arise only under state law, including La. R.S. 30:10, and Petitioners specifically do not allege any federal law claims.

18.

Defendant directly and indirectly transacts business in the State of Louisiana, which transactions gave rise to the causes of action brought in this petition.

VENUE

19.

Venue is proper in Red River Parish under La. Code Civ. Proc. arts. 42 and 76.1. Petitioners' demand for accounting under La. R.S. 30:10 A. (3) is a cause of action in quasi-contract which was executed and performed in Red River Parish.

Page 4 of 20

ALLEGATIONS:

COUNT I:

The allegations and statements set forth in paragraphs 1-19 are incorporated in Count I by this reference.

20.

Defendant is the designated operator of many oil and gas wells in Louisiana. Some of these are the designated unit wells for Louisiana Office of Conservation ("LOC") pooling units (the "Unit Wells" and the "Units", respectively).   Defendant is the operator of record for the HA RA SUE Unit in Section 11, Township 13 North, Range 10 West, Bracky Branch Field, Red River Parish (the "HA RA SUE Unit"). The unit well for the HA RA SUE Unit is the Nichols, et ux 11H-2, LA Serial No.243945 (the "Subject Well").

21.

Petitioners James and Wilma Self own the following tract of land within the HA RA SUE Unit:

> Begin at the Southwest corner of the Southeast Quarter of Section 11, Township 13 North, Range 10 West; thence proceed due North along the Western boundary of said Southeast Quarter a distance of 550 feet; thence proceed dur East a distance of 1,920 feet to the Northwest right of way line of Louisiana State Highway Number 783; thence run in a Southwesterly direction along said right of way 771.1 feet to the South line of the Southeast Quarter of Section 11, Township 13 North, Range 10 West; thence proceed due west along the Southern boundary of said Southeast Quarter 1,379.5 feet to the point of beginning.

22.

Similarly, members of the Class own tracts of land, and/or the right to explore for and produce minerals therefrom, situated in the Units. Defendant is or has been the designated operator for the Unit Wells producing from and for the Units.

23.

Louisiana land and mineral owners have the inherent right to use and enjoy their property in the most unlimited manner for the purpose of exploring and producing minerals, provided it is not prohibited by law. La. R.S. 31:8.

24.

Petitioners, like the members of the Class they seek to represent, are owners of an unleased mineral interest and therefore possesses the right to explore for and produce minerals from their land.

25.

Pursuant to La. R.S. 30 :10 A. (1)(b), the portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced, be considered as if it had been produced from his tract by a well drilled thereon.

26.

Pursuant to La. R.S. 30 :10 A. (1)(b) and the pooling and allocation requirements of the LOC unit orders establishing the Units, Petitioners and the class members are entitled to share in the production from their respective Unit Wells.

27.

Under La. R.S. 30:10 A. (3), if there is included in an LOC pooling unit any unleased mineral interests for which the owner of such interest has not secured separate arrangements to dispose of their allocable share of unit production, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro-rata share of the proceeds of the sale of production within one hundred and eighty (180) days of such sale.

28.

Defendant has opted to proceed with the sale of production from the Subject Well and the Unit Wells.

29.

La. R.S. 30:10 A. (2)(b) identifies the exclusive costs which may be allocated to unleased mineral interest owners within a drilling unit: the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well.

30.

The exclusive costs enumerated by La. R.S. 30:10 may be recovered by unit operators, such as Defendant, solely out of production from the Unit Wells, well by well on an in rem basis.

31.

Petitioners and the Class are entitled to be paid their pro-rata shares of the sales of production from the Subject Well and Unit Wells by the unit operator, without further deduction of any costs beyond the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the Subject Well or Unit Wells.

32.

Upon information and belief, Defendant has allocated and deducted Post-Production Costs against Petitioners' pro-rata share of the sales of production from the HA RA SUE Unit, thereby improperly reducing the value realized by Petitioners below the sales proceeds amount required by statute.

33.

In similar fashion, Defendant has consistently allocated and deducted Post-Production Costs against the Class' pro-rata shares of the sales of production from the respective Units in which they own a mineral interest, thereby improperly reducing the value realized by the Class below the sales proceeds amount required by statute.

34.

Defendant's impermissible allocation of Post-Production Costs to unleased owners has reduced the revenue amounts payable to Petitioners and members of the Class. As a result, Defendant has deviated from the proper computation of the point at which production revenue attributable to each Unit Well exceeds the recoverable costs of drilling, equipping, testing, completing, and operating those wells. This has enabled Defendant to retain revenues properly payable to Petitioners and members of the Class.

35.

Defendant's deduction of Post-Production Costs from Petitioners' allocable share of the proceeds of sales of unit production violates La. R.S. 30:10. Likewise, Defendant has failed to comply with its payment obligations to the Class under that Statute.

36.

Petitioners and the Class request declaratory and permanent injunctive relief to enjoin Defendant from deducting Post-Production Costs from their allocable share of production proceeds

under La. R.S. 30:10 A. (3), and for damages equal to the total amount of Post-Production Costs improperly charged to the share of proceeds owed to Petitioners and the Class.

<u>COUNT II</u>:

The allegations and statements set forth in paragraphs 1-36 are incorporated in Count II by this reference.

37.

In the alternative to Count I set forth hereinabove, should it be found that any Post-Production Costs are lawfully applicable to an unleased mineral interest under La. R.S. 30:10, then Petitioners seek declaratory and injunctive relief to enjoin Defendant from the deduction of Post-Production Costs from Petitioners' and the Class' allocable shares of sales proceeds to the extent the costs represent Gathering Volume Commitments and Transportation Volume Commitments, or which are otherwise excessive and unreasonable under the law, and for damages equal to the total amount of such costs improperly allocated to Petitioners and the Class.

38.

Upon information and belief, Defendant has applied certain Post-Production Costs to Petitioners' and the Class' pro-rata share of revenue which represent, whether in whole or in part Defendant's own costs for Gathering Volume Commitments and Transportation Volume Commitments.

39.

Gathering costs are those generally incurred when an operator decides to move its production from the wellhead to the tailgate of the gathering system.  Gathering costs, as used herein, generally include costs to gather, treat and compress the production prior to reaching the tailgate, or terminus, of the gathering system.

40.

Transportation costs are those generally incurred when an operator decides to move production from the tailgate of the gathering system, to another market further downstream.

41.

In a negotiated contract for either gathering or transportation services, the operator may choose to include overall volume commitments, whereby the operator guarantees the gatherer or

transporter a set amount of production, for which the operator must pay even if the operator fails to place that level of production into the pipeline.   The Gathering Volume Commitments and Transportation Volume Commitments, as termed herein, are a form of such commitments.

42.

Upon information and belief, Defendant has entered into contracts with pipeline companies that include both Gathering Volume Commitments and Transportation Volume Commitments for production from the Subject Well and Unit Wells.

43.

Upon information and belief, Defendant has subsequently failed to meet these overall volume commitments, and as a result it became liable for penalties based upon the contracts negotiated by Defendant.

44.

Such penalties for Gathering Volume Commitments and Transportation Volume Commitments are wholly unrelated to any actual cost related to the movement of Petitioners' or the Class' production, or the movement of any production at all.

45.

However, Defendant applied and deducted these Gathering and Transportation Volume Commitment costs against Petitioners' and the Class' pro-rata share of revenue from production, thereby reducing the value realized by Petitioners or the Class. In addition, it is believed that Defendant has deducted otherwise excessive and unreasonable post-production charges from Petitioners' and the Class' pro-rata share of revenue, thereby further reducing the value realized by Petitioners or the Class.

46.

As set forth above in Count I, the reduction in the value realized by Petitioners and the Class is important, as such adversely affects the determination of the point at which the revenue from each the Subject Wells exceeds their allowed costs under La. R.S. 30:10.

47.

As a result, and in the alternative to Count I, Defendant has deviated from the proper computation of the point at which production revenue attributable to the Subject Well and each

Unit Well exceeds the recoverable costs of drilling, equipping, testing, completing, and operating those wells. This has enabled Defendant to retain revenues properly payable to Petitioners and members of the Class.

48.

Petitioners and the Class request declaratory and permanent injunctive relief to enjoin Defendant from deducting costs of Gathering Volume Commitments and Transportation Volume Commitments from their allocable shares of production proceeds under La. R.S. 30:10 A (3), and judgment for damages equal to the total amount of such costs improperly charged to the share of proceeds owed to Petitioners and the Class from first production to date paid.

### COUNT III:

The allegations and statements set forth in paragraphs 1-48 are incorporated in Count III by this reference.

49.

In the alternative to Count I set forth hereinabove, but in conjunction with Count II, should it be found that any Post-Production Costs are lawfully applicable to an unleased mineral interest under La. R.S. 30:10, which is denied, then Petitioners seek declaratory and injunctive relief to enjoin Defendant from applying Post-Production Costs derived from the Kinderhawk GGA and damages equal to the amount of Post-Production Costs from the Kinderhawk GGA which has been allocated to Petitioners and the Class.

50.

Petitioners and the Class allege, upon information and belief, that in the period of 2007-2009, Defendant, through its parent company Petrohawk Energy Corporation, made the decision to construct a gas gathering pipeline system to serve various wells it operated in Northwest Louisiana, through a wholly-owned subsidiary named Hawk Field Services, L.L.C.

51.

Almost immediately after constructing the Hawk Field Services, L.L.C. gathering system, Defendant made the decision around 2009 to divest all or a portion of its gathering system and sought potential purchasers for this interest.

52.

On or around April of 2010, Defendant, through its parent Petrohawk and along with its affiliate Hawk Field Services, L.L.C., entered into a series of transactions, including a Formation and Contribution Agreement, with KM Gathering Co., L.L.C., an affiliate of Kinder Morgan, Inc. in order to form a new company together named Kinderhawk Field Services, L.L.C. ("Kinderhawk").

53.

As part of these transactions, Hawk Field Services, L.L.C. transferred all of the assets and rights comprising its gathering system to Kinderhawk in exchange for fifty percent (50%) of the equity ownership of Kinderhawk.  KM Gathering Co., L.L.C. agreed to make a "cash contribution" of $875,000,000.00 to the new company, in return for fifty percent (50%) of the equity ownership of Kinderhawk. As part of the same transaction, the $875,000,000 paid to Kinderhawk was immediately paid to Hawk Field Services, L.L.C. as a distribution.

54.

Once Kinderhawk was formed, Defendant, through its affiliate, was a 50% member of Kinderhawk and entitled to receive monthly cash distributions related to the movement of Defendant's production through the Kinderhawk gathering system.

55.

In conjunction with the Kinderhawk deal, Defendant, through its affiliates, entered into the Kinderhawk GGA in order to set the terms for Defendant to continue to move its production through the gathering system it constructed, now the Kinderhawk gathering system.   The Kinderhawk GGA includes the following pertinent terms:

    (1)    A dedication of gas by the Petrohawk-affiliated operating companies in a defined area, including the Defendant's rights in production in force-pooled conservation units.

    (2)    A term for so long as any of the Defendant's interests in the dedicated area, defined as "Leases," continued to exist.   Notably, the definition of "Leases" was not confined to mineral leases, but broadly included *all* interest of the Petrohawk-affiliated operators in production in the designated area.

(3)     A fixed fee for gathering and treating the gas delivered, with a provision for an
        annual rate increase.

(4)     A minimum volume commitment requiring Defendant to pay for a fixed amount of
        gas, regardless of whether that amount was moved through the system.

56.

Therefore, based upon the favorable terms the Kinderhawk GGA provided Kinderhawk, Defendant was able to sell its recently constructed gathering system for $875,000,000, while still receiving the right to participate as a fifty percent (50%) owner in Kinderhawk going forward. This relationship gave Defendant a significant economic interest on the opposite side of the Kinderhawk GGA, as each increase in cost under the Kinderhawk GGA increased the value Defendant received for its interest in the gathering system and increased the revenue it received on its retained fifty percent (50%) interest in Kinderhawk.

57.

In 2011, Petrohawk reportedly sold its remaining fifty percent (50%) interest in Kinderhawk, along with another system, to Kinder Morgan for an additional $855,000,000 million along with the assumption of $65 million in debt owed by the Defendant. Therefore, all told, Defendant received upwards of $1.7 billion related to the sale of its gathering system and its financial interests in the long-term Kinderhawk GGA.

58.

Defendant itself characterized the Kinderhawk transactions as a "failed sale" in reports it filed with the Securities and Exchange Commission. Thus, the amounts received in the transactions were reported by Defendant as a loan, and the gathering rates paid by the Defendant's operating affiliates going forward were treated as a repayment of that loan.

59.

While the costs related to the Kinderhawk GGA have been readily shared with the Petitioners and the Class by deducting the same from their allocable revenue, the profits realized by Defendant have not.

60.

The Post-Production Costs which stem from the Kinderhawk GGA are not lawfully applicable to Petitioners and the Class as unleased mineral owners under La. R.S. 30:10 as such costs are not actual nor reasonable, but instead represent affiliated costs whereby the Defendant has profited at the expense of unleased owners within the Units.

61.

For this reason, Petitioners seek to enjoin the Defendant from applying Post-Production Costs related to the Kinderhawk GGA, and for damages equal to the amount of Post-Production Costs from the Kinderhawk GGA which has been deducted from Petitioners' and the Class' allocable shares of revenue within the Units.

## COUNT IV:

The allegations and statements set forth in paragraphs 1-61 are incorporated in Count IV by this reference.

62.

Petitioners, on behalf of themselves and the Class, request an accounting to recover compensable damages caused by Defendant's violations of La. R.S. 30:10 under Counts I-III set forth above.

## CLASS ACTION ALLEGATIONS

63.

Petitioners bring this petition on behalf of themselves, and also as the proposed class representative under La. C.C.P. art. 591 seeking to represent the following proposed Class:

Every private (non-public) juridical person:

1. Who possesses or possessed the right to explore for and produce minerals from immovable property located in Louisiana, during anytime from January 1, 2008, through present date;

2. Whose mineral rights are not covered by a mineral lease;

3. Whose mineral rights are contained within pooled units created by the Office of Conservation for which Defendant is the designated unit well operator;

4.      Who have had their pro-rata share of production from their respective

pooled units marketed by Defendant, as unit operator.

64.

Excluded from the Class are the Defendants and their officers, directors, and employees,

as well as the Court and its personnel working directly on the case.

65.

Petitioners and all others similarly situated are entitled to have this case maintained as a

class action pursuant to La. C.C.P. art. 591 as the prerequisites for a class action under La. C.C.P.

art 591(A) are met.

66.

The members of the proposed Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Petitioners at this time,

Petitioners believe there are thousands of members in the proposed Class. Members of the Class

are ascertainable from records maintained by Defendant and may also be verified through filings

within the public records.   The Class Members may be notified of the pendency of this action by

mail using a form of notice customarily used in similar actions.

67.

There is a well-defined community of interest in that the questions of law and fact common

to the Class under La. R.S. 30:10 predominate over questions affecting only individual Class

Members and include, but are not limited to, the following:

a.      Whether a unit operator who markets an unleased owner's share of unit gas can

deduct the operator's Post-Production Costs against the unleased owner's share of

unit proceeds under La. R.S. 30:10.

b.      If Post-Production Costs are applicable to an unleased mineral interest under La.

R.S. 30:10, then whether a unit operator who markets an unleased owner's share of

unit gas can deduct the operator's Gathering and Transportation Volume

Commitment costs against the unleased owners share of unit proceeds under La.

R.S. 30:10.

c.     If Post-Production Costs are applicable to an unleased mineral interest under La.
R.S. 30:10, then whether a unit operator can deduct costs negotiated through an
affiliated agreement whereby the operator has benefited due to the onerous terms
causing such costs.   These and other common issues of law and fact relate to and
affect the rights of Plaintiff and Class Members.

68.

Petitioners' claims are typical of the claims of the members of the Class, as all members of
the Class are similarly situated as unleased mineral interest owners within forced pooled units
operated by Defendant and were therefore similarly harmed by Defendants' wrongful conduct in
violation of Louisiana law that is complained of herein. Plaintiffs and the Class Members have
suffered damages all stemming from the common trunk of facts and issues related to the improper
allocation of costs by Defendant.

69.

Defendant engaged in a common course of conduct that did not vary from Class member
to Class member, ensuring that common questions of law and fact predominate over questions
regarding individual damages.

70.

Petitioners will fairly and adequately represent and protect the interests of the Members of
the Class because their interests do not conflict with and are aligned with the interests of the Class
Members they seek to represent.   Petitioners know and are prepared to undertake representation
of the interests of the entire Class. Petitioners have no claims antagonistic to those of the Class.
Petitioners have retained counsel who are experienced and competent in the litigation of complex
class actions and mineral rights-related lawsuits.     Petitioners, through their counsel have
adequate financial resources to assure that the interests of the class will be protected.

71.

A class may be maintained under La. C.C.P. art 591(B)(1) because the prosecution of
separate actions by individual members of the class would create a risk of inconsistent or varying
adjudications and could establish incompatible obligations for Defendant, as well as other

operators within the State.  Adjudications of individual members of the class would also as a practical matter be dispositive of the interests of other members not parties to those adjudications or substantially impair or impede their ability to protect their interests with respect to improperly allocated costs by Defendant.

72.

A class may be maintained under La. C.C.P. art. 591 (B)(2) because the party opposing the class, Defendant, has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.  Upon information and belief, Defendant has deducted Post-Production Costs generally to the entire Class, so that injunctive and declaratory relief is appropriate respecting the Class as a whole. Defendant's wrongful conduct affects all Class Members similarly.  Petitioners seeks the same declaratory and injunctive relief for the Class as a whole because Defendant uniformly failed to act in compliance with La. R.S. 30:10.

73.

Further, any denial of liability and defenses raised by the Defendants would be applicable to all claims presented by all members of the class or can otherwise be managed through available procedures.

74.

Defendant's conduct presents predominant common factual questions. Fundamentally, all of the Class Members' claims arise out of a single course of conduct by Defendant of improperly allocating production costs to unleased landowners.  Although this practice has been put in place by Defendant throughout the State of Louisiana, the decision to do so was made at the corporate level.  Petitioners and the Class Members will present common liability proof that is the same for each member of the Class. Petitioners' common proof of Defendant's liability will involve substantially the same cast of characters, events, discovery, documents, fact witnesses, and experts.

75.

The need for proof of Petitioners' and Class Members' damages will not cause individual issues to predominate over common questions. The amounts of economic losses can be efficiently demonstrated either at trial or as part of routine claims administration through accepted and court

approved methodologies with the assistance of court appointed personnel, including Special Masters.

76.

The disposition of the claims asserted herein through this class action is the most efficient means of handling these claims and the best way to ensure the interest of the Class Members are preserved and will also benefit the Court. Joinder of all Class Members is impracticable and the expense and burden of individual litigation makes it impossible for many members of the Class to individually seek compensation for the illegal actions of Defendants. Class treatment will permit thousands of similarly situated mineral interest owners to get common declaratory and injunctive relief in a single forum simultaneously, efficiently, and without the duplication of efforts and expenses required by individual actions. Members of the Class will be readily ascertainable from records of the Defendants and the State, and no difficulties are likely to be encountered in the management of this case that would preclude its maintenance as a class action. A class action is thus superior to other methods of adjudicating these claims because it is more efficient, consistent, and economical while enabling the Court to more effectively manage the litigation.

JURY DEMAND

77.

Petitioners, and the class they seek to represent, are entitled to and do hereby demand a trial by jury.

PRAYER

WHEREFORE, Petitioners, James and Wilma Self, and all those similarly situated, pray that after due proceedings be had, that this Court order:

1.  Certification of this case as a class action on behalf of the Class defined in Paragraph 63, above, and appointment of Petitioners, James and Wilma Self, as class representatives, and appointment of undersigned counsel as counsel of record for the Class;

2.  Judgment in favor of Petitioners and the Class and against Defendant declaring that Post-Production Costs may not be deducted from the Petitioners' and Class'

allocable shares of production under La. R.S. 30:10(A)(3) and enjoining Defendant from making such deductions in the future;

3.    Judgment in favor of Petitioners and the Class and against Defendant for damages equal to the total amount of Post-Production Costs improperly allocated to Petitioners and the Class.

4.    In the alternative, should the Court not issue the judgment sought directly above, judgment in favor of Petitioners and the Class and against Defendant declaring that costs of Gathering Volume Commitments and Transportation Volume Commitments, or other Post-Production Costs that are otherwise unreasonable or excessive, may not be deducted from Petitioners' and the Class' respective allocable shares of unit production and enjoining Defendant from making such deductions in the future;

5.    Judgment in favor of Petitioners and the Class and against the Defendant for damages equal to the total amount of the Gathering Volume Commitments and Transportation Volume Commitments, or otherwise excessive or unreasonable Post-Production Costs, improperly allocated to Petitioners and the Class.

6.    In the alternative, if the Court declines to issue the judgment sought in Paragraph 2 above, judgment in favor of Petitioners and the Class and against Defendant declaring that costs arising from the Kinderhawk GGA may not be deducted from Petitioners' and the Class' respective allocable shares of unit production and enjoining Defendant from making such deductions in the future, and for damages equal to the total amount of the Kinderhawk GGA costs improperly allocated to Petitioners and the Class.

7.    Judgment in favor of Petitioners and the Class and against Defendant ordering Defendant to render an accounting to Petitioners and the Class for all Post Production Costs and other costs deducted from unit well proceeds from date of the first sale of production to the present, from the Units by Defendant as operator.

8.    Judgment in favor of Petitioners and against Defendant in a monetary amount equal to all Post-Production Costs applied to Petitioners' and the Class' allocable shares

of Unit production for any time Defendant operated such Units and sold Unit production from the date of first sales from the applicable Unit until the present; or, alternatively, in a monetary amount equal to all deductions for costs of Gathering Volume Commitments, Transportation Volume Commitments, excessive or unreasonable Post-Production Costs and Kinderhawk GGA costs applied to Petitioners' and the Class' allocable share of Unit production for any time Defendant operated such Units and sold Unit production from the date of first sales from the applicable unit until the present;

9.     After due proceeding be had that Defendant be cast in judgment for the full amount of the Petitioners' and the Class' damages including, but not limited to applicable penalties, attorneys' fees, court costs and expert witness fees, together with legal interest thereon from the date the obligations arose or, in the alternative, the date of judicial demand, whichever the court finds applicable, and for all other appropriate legal and equitable relief.

Respectfully submitted by,

Randall S. Davidson, LSBA No. 4715
Grant E. Summers, LSBA No. 23953
Andrew D. Martin, LSBA No. 34947
J. Davis Powell, LSBA No. 33631
DAVIDSON SUMMERS, APLC
330 Marshall Street, Suite 1114
Shreveport, Louisiana 71101
Ph: (318) 424-4342 | Fax: (318) 226-0168
Email: rsdav@davidsonsummers.com
        gsummers@davidsonsummers.com
        dmartin@davidsonsummers.com
        dpowell@davidsonsummers.com

-and-

Sally D. Fleming, LSBA No. 20814
Owen M. Courrèges, LSBA No. 31113
THE LAW OFFICE OF
SALLY DUNLAP FLEMING, P.L.C.
829 Baronne Street
New Orleans, Louisiana 70113
Ph: (504) 891-3090 | Fax: (504) 895-5190
Email: fleminglawfirmnola@gmail.com
        owen@courregeslaw.com

-and-

Michael G. Stag, LSBA No. 23314
Ashley M. Liuzza, LSBA No. 34645
Matthew D. Rogenes, LSBA No. 36652
STAG LIUZZA, LLC
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Ph: (504) 593-9600 | Fax: (504) 593-9601
Email: mstag@stagliuzza.com
        aliuzza@stagliuzza.com
        mrogenes@stagliuzza.com

*Counsel for James and Wilma Self*

PLEASE HOLD SERVICE AT THIS TIME.

FILED
STUART SHAW

MAR 22 2019

CLERK OF COURT
RED RIVER PARISH

37402

| | | |
|---|---|---|
| JAMES AND WILMA SELF | § | DOCKET NO. _____ |
| | § | |
| VERSUS | § | 39TH JUDICIAL DISTRICT COURT |
| | § | |
| BHP BILLITON PETROLEUM | § | |
| (TXLA OPERATING) CO. | § | RED RIVER PARISH, LOUISIANA |

## VERIFICATION

STATE OF LOUISIANA

PARISH OF RED RIVER

BEFORE ME, the undersigned authority, personally came and appeared James Self who, after being first duly sworn, did depose and state that he is a Plaintiff in the foregoing *Petition Against BHP Billiton Petroleum (TXLA Operating) Company For Class Certification, Declaratory Judgment, Injunctive Relief, And Damages* and that the information contained therein is true and correct to the best of his knowledge, information and belief.


James Self

SWORN TO AND SUBSCRIBED BEFORE ME, on this 22nd day of March, 2019.

_____
NOTARY PUBLIC

J. DAVIS POWELL
Notary Public
State of Louisiana
Caddo Parish
Bar Roll # 33631
My Commission is for Life

Page 1 of 1

# EXHIBIT

# "2"

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

| | | |
|---|---|---|
| **JAMES & WILMA SELF** | * | **CIVIL ACTION NO.** _____ |
| | * | |
| | * | |
| **VS.** | * | **HONORABLE JUDGE** _____ |
| | * | |
| **BHP BILLITON (TXLA OPERATING)** | * | |
| **COMPANY** | * | **MAGISTRATE JUDGE** _____ |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION PURSUANT TO 28 U.S.C. § 1746 OF VANESSA BASTIAN

Pursuant to the provisions of 28 U.S.C. § 1746, and in lieu of an affidavit, VANESSA BASTIAN offers the following declaration:

1.  I am a person of full age of majority. I have been working for BHP Billiton (TXLA Operating) Company ("BHP") since August 2011, and I am currently employed as a Lead Regulatory, Finance Business Partnership Shale. The declarations made herein are based on my own personal knowledge and review of the business records of BHP.

2.  As part of my job duties, I oversee the preparation and transmittal of unleased mineral owner reports pursuant to La. R.S. 30:103.1 *et seq.* to various unleased mineral owners on behalf of BHP and its affiliated entities, and I am knowledgeable and familiar with unleased owner reports sent to unleased owners in wells that BHP and its affiliated entities operate in the Haynesville Shale in the State of Louisiana.

3.  BHP and its affiliated entities currently provide unleased mineral owner reports to hundreds of persons, and there are over 100 unleased mineral owners in the wells/units operated by BHP and its affiliated entities.

4.  I reviewed recent unleased mineral owner reports to determine the gross amount of marketing/post-production costs associated with production from a selection of wells/units operated by BHP and its affiliated companies. The gross amount of marketing/post-productions costs associated with the selected wells/units is as follows:

    a.  Nichols 11H-2        HA RA SUE        $9,553,621.00

    b.  Kervin 18H-1        HA RB SU79        $6,157,139.00

1

   c.  Henry Thrash 24H-1     HA RA SUFF    $5,287,598.00

   d.  Bolton 35H-1        HA RA SU86    $7,278,812.00

   e.  Langford 23H-1      HA RA SU63    $5,489,929.00

5.    I declare that the figures referenced in Paragraph 4 representing the gross amount of marketing/post-production costs for each of the referenced wells/units is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _17th_ day of _July_, 2019, _Harris County_, Texas

_Vanessa Bastian_

VANESSA BASTIAN

2

# EXHIBIT

# "3"

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## SHREVEPORT DIVISION

| | | |
|---|---|---|
| **JAMES & WILMA SELF** | * | **CIVIL ACTION NO.** _____ |
| | * | |
| | * | |
| **VS.** | * | **HONORABLE JUDGE** _____ |
| | * | |
| **BHP BILLITON (TXLA OPERATING)** | * | |
| **COMPANY** | * | **MAGISTRATE JUDGE** _____ |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION PURSUANT TO 28 U.S.C. § 1746 OF CASSIE BALDWIN

Pursuant to the provisions of 28 U.S.C. § 1746, and in lieu of an affidavit, Cassie Baldwin offers the following declaration:

1. I am a person of full age of majority. I have been working for BHP Billiton (TXLA Operating) Company ("BHP") since 2011, and I am employed as a Division Order Manager for the Haynesville production area. The declarations made herein are based on my own personal knowledge and review of the business records of BHP.

2. As part of my job duties, I regularly review and confirm unit decimals, which represent the percentage of ownership attributable to each owner in a unit, associated with various unleased mineral owners in various drilling and production units operated by BHP and its affiliated entities.

3. I have analyzed the unit decimals associated with certain unleased mineral interests in the wells/units referenced below, all of which are units formed in the State of Louisiana. Based on the current information contained in BHP's business records, the following percentages reflect the minimum percentage of unleased ownership in the wells/units referenced below:

| | | | |
|---|---|---|---|
| a. | Nichols 11H-2 | HA RA SUE | .10259 |
| b. | Kervin 18H-1 | HA RB SU79 | .06248 |
| c. | Henry Thrash 24H-1 | HA RA SUFF | .0808736 |
| d. | Bolton 35H-1 | HA RA SU86 | .21133871 |
| e. | Langford 23H-1 | HA RA SU63 | .50793131 |

4.    The figures referenced above represent only a subset of the percentages associated with unleased mineral interests in wells/units operated by BHP and its affiliated entities. Additional marketing/post-production costs may be associated with other unleased mineral interests in the referenced wells/units and unleased mineral interests associated with other wells/units not referenced above.

5.    I also reviewed the unit decimal associated with the named Plaintiffs in the captioned action for the Nichols 11H-2 well (HA RA SUE Unit) and confirmed that the unit decimal associated with the named Plaintiffs is .03198.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of July, 2019 Harris County, Texas.

_Cassie Baldwin_

CASSIE BALDWIN